# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2016 FEB 22 PM 3:00

CLERK _____
SO. DIST. OF GA.

| | | |
|---|---|---|
| SONJA BLOODWORTH, | * | |
| | * | |
|     Plaintiff, | * | |
| | * | |
| | * | |
|     v. | * | |
| | * | |
| CHARLES E. PARKER, ELAINE | * | CIVIL ACTION NO. 315-031 |
| BAILEY, SUSAN COLEY, and GLENN | * | |
| PITTMAN, Individually and in | * | |
| their Official Capacities as | * | |
| Mayor and Members of the City | * | |
| Council of the City of Chester, | * | |
| Georgia, and the CITY OF | * | |
| CHESTER, GEORGIA, | * | |
| | * | |
|     Defendants. | * | |

## O R D E R

Plaintiff Sonja Bloodworth ("Plaintiff"), a black female, is suing her former employer, the City of Chester, Georgia, its Mayor, Charles E. Parker, and three of the four City Council Members (Elaine Bailey, Susan Coley, and Glenn Pittman), asserting a claim of discriminatory discharge. The case is presently before the Court on Defendants' motion for summary judgment. Upon consideration of the record evidence, the relevant law, and the briefs of counsel, the motion for summary judgment is **GRANTED**.

# I. BACKGROUND

## A. Factual Background

The City of Chester has two employment positions relevant to this lawsuit: the full-time position of City Clerk and the part-time position of Assistant City Clerk. Both positions are supervised by the Mayor of Chester, who is also responsible for the hiring and firing for these positions.

On October 21, 2013, Mayor Charles E. Parker (the "Mayor"), a black male, hired Plaintiff as the Assistant City Clerk upon a recommendation of City Councilwoman Vanessa Henley, a black female who was not named as a defendant in this lawsuit. (Defs.' St. of Material Facts[1] ¶¶ 2-4.) At that time, the City Clerk was Melanie McCook, a white female. (Id. ¶ 7.) McCook had been in the position of City Clerk for three months. (McCook Dep. at 5-6.) Prior to that, she had been the Assistant City Clerk and a substitute clerk for the City Clerk. McCook's employment with the City of Chester began in 2011. (Id.)

At the time of her hiring, Plaintiff did not sign a contract of employment nor was there any discussion that she could become the City Clerk in the event that McCook was no

---

[1] The Court's citation to Defendants' Statement of Material Facts indicates that Plaintiff has admitted the stated fact. (See Doc. Nos. 20-2 & 26-2.)

longer in that position.  (Defs.' St. of Material Facts ¶¶ 9-10.)

Plaintiff worked 19.5 hours per week and could choose her own schedule.  (Id. ¶¶ 11-12.)  McCook worked 32.5 hours per week.  (Id. ¶ 13.)  Both positions have similar job duties. The only difference on record is that only the City Clerk could sign checks and other documents requiring a signature. (Id. ¶ 14.)  Also, the City Clerk has employment benefits because it is a full-time position. (McCook Dep. at 10.)

According to McCook, Plaintiff's hostility toward her began on Plaintiff's first day of work.  (Id. at 13.)  McCook recounts several tense episodes between the two women in her deposition, the substance of which is not relevant here. (See id. at 13-16, 28.)  For her part, Plaintiff denies these allegations and avers that she and McCook had no conflict between them.  (See generally Pl.'s Aff. ¶¶ 5-9, 16-26; Pl.'s Dep. at 23.)

In March 2014, McCook told the Mayor about the alleged problems between her and Plaintiff.  (McCook Dep. at 13, 17; Parker Dep. at 57-58.)  When the Mayor expressed that he would simply get rid of Plaintiff, McCook claims she told him that she was not asking for that.  (McCook Dep. at 29, 41.) Shortly thereafter, the issue was brought up at the conclusion of a City Council meeting, at which time McCook shared her

complaints about Plaintiff's alleged poor attitude. (McCook Dep. at 10-12; Pittman Dep. at 9; Henley Dep. at 8.) The City Council determined that they should hear from both women (Henley Dep. at 9; Pittman Dep. at 9); however, the next morning, on March 18, 2014, McCook left a letter of resignation on the Mayor's desk (Henley Dep. at 8-9). The letter stated in part: "Under normal circumstances I would have given a two weeks notice, but due to the issues that have led me to resign, I feel it is better to go ahead and leave immediately. . . . I cannot, for the sake of my own peace of mind, work in what has become a hostile work environment." (Parker Dep., Ex. 2.) McCook explained that she resigned because the matter was becoming "a big mess" with the City Council becoming involved; she had hoped the Mayor would handle it himself. (McCook Dep. at 10-12.)

Following McCook's resignation, Plaintiff performed the duties of City Clerk on a temporary basis. (Defs.' St. of Material Facts ¶ 44.) While her hours increased to 32.5 per week, she earned the same hourly wage as she did as the Assistant City Clerk. (Id. ¶ 45.) During that time, Plaintiff never complained about her pay or asked for a raise. (Pl.'s Dep. at 29.) Plaintiff asked the Mayor about being considered for the position permanently. (Defs.' St. of Material Facts ¶ 47.) According to Plaintiff, the Mayor said

she would be considered when the job was posted. (Pl.'s Dep. at 33-35.) The Mayor, however, testified that the position did not need to be posted and that he was looking to hire someone else as the full-time City Clerk because he felt that Plaintiff lacked the necessary experience. (Parker Dep. at 27, 54.)

Plaintiff claims that after McCook resigned, the Mayor began making negative comments about African-Americans.[2] (Pl.'s Dep. at 31-32.) The comments would come up during regular conversations and made Plaintiff "somewhat" upset; however, she was able to overlook the comments because of the Mayor's age and negativity and because the Mayor is black. (Defs.' St. of Material Facts ¶ 56.) Plaintiff never complained to the City Council about the Mayor's racist comments or the environment she was working in. (Id. ¶ 59.)

With respect to his hiring practices, the Mayor expressed his desire to hire an equal balance of African-American and Caucasian employees. (Id. ¶ 62.) Plaintiff also testified that the Mayor expressed a desire to hire one black person and one white person for various positions. (Pl.'s Dep. at 32.) In his position as Mayor, he had hired several African-

---

[2] Plaintiff testified that the comments included: "these niggas ain't gonna do right"; "none of these niggas voted for me"; "you know these niggas steal"; and "I don't know any smart, educated black people and that everything that a black man gets has to go to the white man". (Defs.' St. of Material Facts ¶ 55.)

American employees to fill positions both inside and outside of the office. (Defs.' St. of Material Facts ¶ 64.) Nevertheless, the Mayor testified that race was not a factor in the hiring process because the City of Chester was so small that it was difficult to find good employees. (Parker Dep. at 33, 42.)

While the Mayor had the authority to hire and fire, he would seek the input of the City Council members about his employment decisions. (Defs.' St. of Material Facts ¶ 66.) Prior to terminating Plaintiff, the Mayor talked to the City Council members and explained that he planned to terminate Plaintiff and rehire McCook. (Id. ¶ 67.) He expressed to them that he felt McCook could be trusted to do a better job because she had more experience and knowledge. (Parker Dep. at 30-31.) The Mayor recalled that all of them agreed except perhaps Ms. Henley, who did not say much during the discussion. (Parker Dep. at 30.) Henley testified that she did not agree with the decision. (Henley Dep. at 7.) She did not believe, however, that the Mayor made the decision based upon race. (Id. at 14.)

On June 25, 2014, the Mayor terminated Plaintiff. (Defs.' St. of Material Facts ¶ 71.) As it turns out, the Mayor had been asking McCook on the occasions that he saw her "here and there" to come back to work, but McCook had declined. (McCook Dep. at 31-32.) At some point, perhaps the

week of Plaintiff's termination, the Mayor explained to McCook that he was going to fire Plaintiff and wanted her to come back because he could not have an empty office. (Id. at 30, 32.) McCook agreed. McCook was rehired to the City Clerk position and started the day after Plaintiff was terminated. (Id. at 30.) A white female, Michelle Charlin, was hired as the Assistant City Clerk subsequent to Plaintiff's termination. (Defs.' St. of Material Facts ¶¶ 72-73.)

## B. Procedural Background

Plaintiff filed this lawsuit on March 24, 2015. She claims that she was terminated because of her race in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1983. She further claims that the Mayor's discriminatory discharge was authorized and approved by the white members of the City Council and that he was acting pursuant to a custom or policy of disparate treatment of the City of Chester.[3]

Defendants filed the instant motion for summary judgment on December 4, 2015. The Clerk of Court gave Plaintiff notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No.

---

[3] Plaintiff also claims that the Mayor's "daily use of racially offensive language created a work environment that was not only unpleasant for Plaintiff, but also hostile and patently offensive to her as an African American." (Compl. ¶ 30.) Plaintiff, however, states in brief that she has not alleged a separate hostile work environment claim. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 26, at 27.) Thus, the Court need not discuss the Mayor's alleged racial comments in the context of a hostile work environment claim.

23.)  Therefore, the notice requirements of <u>Griffith v.</u>
<u>Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam),
have been satisfied.  Plaintiff filed a responsive brief, and
Defendants filed a reply brief.  The time for filing materials
in opposition has expired, and the motion is ripe for
consideration.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  Facts are "material" if they could affect the outcome
of the suit under the governing substantive law.  <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The Court must
view the facts in the light most favorable to the non-moving
party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475
U.S.  574,  587  (1986),  and  must  draw  "all  justifiable
inferences in [its] favor," <u>United States v. Four Parcels of</u>
<u>Real Prop. in Greene and Tuscaloosa Cntys.</u>, 941 F.2d 1428,
1437 (11th Cir. 1991) (en banc) (internal punctuation and
citations omitted).

The moving party has the initial burden of showing the
Court, by reference to materials on file, the basis for the
motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).
How to carry this burden depends on who bears the burden of

proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If – and only if – the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with

evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

## III. LEGAL ANALYSIS

42 U.S.C. § 1983 creates a federal remedy for deprivations of federal rights. Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987). Section 1983 does not create a substantive right, but "merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989). In this case, Plaintiff asserts a claim under § 1983 for the violation of her Equal Protection rights under the Fourteenth Amendment to the United States Constitution and the

prohibition against racial discrimination established by 42 U.S.C. § 1981.[4]

Plaintiff claims that Defendants violated her rights through her discriminatory discharge. She presses this claim against her employer, the City of Chester, as well as against the individual Defendants in both their personal and official capacities. The Eleventh Circuit has explained the difference between these claims as follows:

> "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" In other words, a plaintiff in an action against a government official in his personal capacity can recover only against the official's personal assets. The assets of the governmental entity are not accessible. The reverse is true in an official capacity lawsuit. Furthermore, "to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. . . . [I]n an official-capacity suit the entity's 'policy or

---

[4]  Section 1981 guarantees "all persons . . . the same right . . . to make and enforce contracts . . . as enjoyed by white citizens." This guarantee includes the right to be free from intentional race discrimination in employment. Ferrill v. Parker Group, 168 F.3d 468, 472 (11th Cir. 1999). Section 1981 does not, however, provide a cause of action against state actors. Rather, 42 U.S.C. § 1983 "constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." Bryant v. Jones, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009). Indeed, the law of this Circuit is that § 1981 claims against state actors are "effectively merged" into § 1983 claims. Busby v. City of Orlando, 931 F.2d 765, 771 n.6 (Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." (quoted source omitted)); see also Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (holding that any relief available under § 1981 was duplicative of that available under § 1983). Accordingly, to the extent that Plaintiff asserts a § 1981 claim separate and apart from her § 1983 claim, Defendants are entitled to summary judgment. Otherwise, Plaintiff's § 1981 claim is merged into her § 1983 claim.

custom' must have played a part in the violation of federal law."

*Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992) (quoted sources and citations omitted). Thus, Plaintiff's § 1983 personal capacity claim against the Mayor and the City Council members is governed by different standards than those applicable to her official capacity claim against these Defendants and the City of Chester. The Court will address separately Plaintiff's claim of discriminatory discharge against the Mayor and the City Council Members in their individual capacities and her claim against the City of Chester and the individual Defendants in their official capacities.

**A.  Discriminatory Discharge Claim Against Defendants in their Individual Capacities**

A plaintiff alleging discriminatory discharge may prove a prima facie case in one of two ways - either through the production of "direct evidence" of discrimination or through the production of "circumstantial evidence" that creates an inference of discrimination.[5]  *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999).  When a plaintiff bases her case on circumstantial evidence, the so-called burden shifting analysis of *McDonnell Douglas*[6] and its progeny is used.  The

---

[5]  Section 1983 race discrimination claims are analyzed using the identical methods of proof used in cases brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).  *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995).

[6]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

burden shifting analysis requires a plaintiff to first come forward with evidence sufficient to establish a prima facie case of discrimination. This creates a rebuttable presumption of unlawful discrimination. The defendant is then called upon to articulate a legitimate, non-discriminatory reason for its allegedly discriminatory decision. The production of this reason serves to shift the burden back to the plaintiff, who then must produce evidence of "pretext," that is, to show the proffered reasons are "not the true reasons for the employment decision." See Brooks v. County Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162-63 (11th Cir. 2006) (citations and quoted sources omitted). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." Id. at 1162 (quoting EEOC v. Joe's Stone Crab, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002)). The McDonnell Douglas analysis is not used to evaluate claims based on direct evidence. Burns v. Gadsden State Comm. College, 908 F.2d 1512, 1518 (11th Cir. 1990). Plaintiff in this case claims to have both direct and circumstantial evidence of discrimination. The Court will address each method of proof separately.

### 1.  Direct Evidence

"Direct evidence of discrimination would be evidence,

which, if believed, would prove the existence of a fact without inference or presumption." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). Further, the direct evidence reflecting a discriminatory attitude must correlate or relate to the discrimination complained of by the plaintiff. Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641-42 (11th Cir. 1998).

In this case, Plaintiff puts forth the following as direct evidence of her discriminatory discharge. First, Plaintiff points to the fact that the Mayor continued to ask McCook to come back and eventually convinced her to do so by telling her that he would fire Plaintiff. In order for this circumstance to be considered evidence of discrimination, an inference must be drawn that the Mayor preferred McCook over Plaintiff only because she is white.[7] The need to draw this inference disqualifies this evidence as direct evidence.

Second, Plaintiff puts forth a hearsay statement of Councilwoman Henley, who testified that the Mayor said, "I'm going [to] keep me a white clerk." (See Henley Dep. at 12)

---

[7] The Court notes that if the Mayor had been motivated by race, then he could have approached a white person other than McCook to replace Plaintiff.

The comment, however, is isolated and is not placed into context. With no context, a reasonable jury could not relate this comment to Plaintiff's termination. Accordingly, the comment does not suffice to show discriminatory discharge.

Third, Plaintiff points to the Mayor's alleged racist comments to her after McCook's resignation. Again, however, these comments were not made concurrently with Plaintiff's termination, and they do not relate to any employment position, let alone Plaintiff's position. That is, to say that Plaintiff has identified a racial bias in the Mayor is not the same thing as saying that the Mayor exercised that bias in terminating Plaintiff. See Williamson v. Adventist Health System/Sunbelt, Inc., 372 F. App'x 936, 940 (11th Cir. 2010) ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination.")

In conclusion, Plaintiff has failed to present direct evidence of discriminatory discharge.

## 2. Circumstantial Evidence

In accordance with the McDonnell Douglas burden shifting analysis, the Court will first look to whether Plaintiff has established a prima facie case of discrimination in the instant case. A plaintiff may establish a prima facie case of disparate treatment by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3)

she suffered an adverse employment action; and (4) she was replaced by a person outside of her protected class or was treated less favorably than a similarly-situated individual outside of her protected class. Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). Here, it is undisputed that Plaintiff belongs to a protected class, was qualified for her position, and suffered an adverse employment action when she was terminated. It is also undisputed that the position of Assistant City Clerk was filled by a white female, Michelle Charlin.[8] Thus, the Court finds that Plaintiff can establish a prima facie case of discriminatory discharge.

The Court will now examine whether Defendants have articulated a legitimate, non-discriminatory reason for her termination. Here, the Mayor testified that he had been informed that Plaintiff and McCook were not getting along, and after McCook resigned, he determined that he wanted to rehire McCook because he believed she was more experienced and reliable. In brief, Plaintiff contends that this articulated reason is an "after the fact effort to justify" Plaintiff's termination unsupported by the record. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 26, at 20.) Plaintiff complains that there is no contemporaneous evidence or

---

[8] There is also an argument to be made that Plaintiff was replaced by McCook in the position of City Clerk, even though Plaintiff was only filling in that position temporarily.

documentation of the Mayor's reason for Plaintiff's termination. The law, however, does not require that an employer put its rationale in writing contemporaneous to the termination. Further, sworn testimony regarding the rationale is evidence. In this case, the articulated reason for the Mayor's decision is repeatedly stated in his deposition; he testified that he felt McCook could do the job better. (Parker Dep. at 25 ("I knew that [McCook] could do the job . . . ."); 30-31 (explaining that he told the City Council he was "replacing - letting [McCook] come back because I felt like she was doing a good job, and I wasn't - and I could trust her on sending paperwork off and it be right, and I wouldn't have to hear no more about it"); 31 (stating that Plaintiff "didn't know as much as [McCook] knows"); 41 ("I had worked with [McCook]. I didn't have no problems, and she was a good clerk when we hired [Plaintiff], and if you're going to have somebody - well, you already know about that, them the one you think you need."); and 45 ("I thought [McCook] was my best clerk, and it wasn't because she was white. I just had no problems . . . .").) There is also evidence that the Mayor explained his rationale to the City Council members prior to terminating Plaintiff. (Pittman Dep. at 12 (explaining that the Mayor told him he "just felt more comfortable with Ms. McCook and the job that she had done and the time that he had already invested in Ms. McCook"); Coley Dep. at 7 (explaining

that the Mayor told her that "they wasn't getting along, so - and he said he would like to have [McCook] back because, you know, she's - she's been here the longest").) In short, the record amply supports that the Mayor was concerned about the conflict between Plaintiff and McCook and simply preferred McCook over Plaintiff. (See Parker Dep. at 22 ("[I]t's not racial because, if you can't get along with one another, you've got to divide them.").) This rationale is sufficient to meet Defendants' minimal burden of production at this stage.

The analysis now turns to whether Plaintiff can show the Mayor's legitimate, non-discriminatory reason for her termination is pretext. A plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). The law of this Circuit is clear: "A reason is not pretextual unless it is shown both that the reason was false, and that retaliation was the real reason." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (citing Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)); Morrison v. City of Bainbridge, Ga., 432 F. App'x 877, 881 (11th Cir. 2011) (same). "[The plaintiff] may succeed in this either directly by persuading the court that

a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. The plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotations omitted).

To establish pretext, Plaintiff again complains that the Mayor's reasons are not documented. As shown above, this contention is simply inaccurate. The evidence shows that the Mayor explained his reasoning to City Council members (see Pittman Dep. at 12; Coley Dep. at 7), and he began imploring McCook to return to her position four days after she resigned (McCook Dep. at 32). His preference for McCook was a matter of record at the time the decision was made to fire Plaintiff.

Plaintiff also relies heavily on her testimony that she and McCook got along very well. She offers several anecdotes why McCook's allegations that they did not get along are unworthy of credence.[9] Plaintiff reasons that because the

_____

[9] The Court need not resolve the issue of whether Plaintiff and McCook actually got along. It is sufficient for Defendants to show that the Mayor believed that they did not get along. McCook testified that she told the Mayor they were not getting along; the Mayor and McCook told the City Council that they were not getting along; and McCook's resignation letter complains of her hostile work environment. Plaintiff has offered

Mayor was completely wrong about the conflict between the two women, his legitimate, non-discriminatory reason to terminate her is pretextual.

Whether McCook and Plaintiff actually got along is wholly irrelevant.  The inquiry in this case focuses on the Mayor's motivation to fire Plaintiff.  "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  <u>Nix v. WLCY Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1187 (11th Cir. 1984); <u>see also</u> <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer believed employee was guilty of misconduct and if so, whether that was the reason behind discharge; that employee did not actually engage in misconduct is irrelevant).  The Eleventh Circuit has cautioned that in analyzing issues like this one, a court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 (11th Cir. 2002). Instead, the sole concern is whether "unlawful discriminatory animus" motivated the adverse decisions.  <u>Id.</u>  In this case, Plaintiff presents no evidence that her employer acted with

---

no evidence to cast doubt on the Mayor's *perception* that he had a conflict in the City Clerk's office.

discriminatory animus.[10]

Plaintiff cannot survive summary judgment without evidence of discriminatory intent. She has presented none, and she has not persuaded the Court that the Mayor's proffered reason for firing her and rehiring McCook is unworthy of credence. In fact, Plaintiff betrays her own case in the following exchange during her deposition:

> Q: And how - how did you suspect or know that he was going to bring [McCook] back?
>
> A: Because for one thing, his ways changed towards me. So, therefore, I knew he wanted a white person in the office. I could tell, you know, he preferred her over me, even though I knew how to do the job.
>
> Q: Well, he may have preferred Ms. McCook whether she was white or black. Did you consider that?
>
> A: I did not. I did not. Not at all.
>
> Q: Did you understand that he might have had a good working relationship with her going back a long time before you had been working for him?
>
> A: No.
>
> Q: You didn't?
>
> A: I - that hadn't. That had never crossed my mind. I had never thought about that.
>
> Q: It's possible, isn't it?

---

[10] Though Plaintiff does not present this as evidence of pretext (see Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 26, at 21-27), an argument could be made that the random, unrelated racial comments allegedly made by the Mayor to Plaintiff evidences discriminatory animus. While these comments may suggest a racial bias, they do not rise to a level sufficient to allow a reasonable jury to determine that a discriminatory reason more likely motivated the Mayor's termination or that his proffered explanation is unworthy of credence.

A:    It could have been.

(Pl.'s Dep. at 38-39.)  Simply put, Plaintiff did not allow for the possibility that the Mayor's preference for McCook was anything other than racial.  Plaintiff then closes her deposition with the following statement: "[T]he fact that [McCook] is white and I am black even more says that he prefers to work with a white person than a black person." (Id. at 52-53.)  This syllogism-that because the Mayor chose McCook over Plaintiff, it must have been based upon race-is too attenuated to sustain a claim of discriminatory discharge. Yet, this is all that Plaintiff has.  Without evidence of discriminatory animus toward Plaintiff, Defendants are entitled to summary judgment on Plaintiff's claim of discriminatory discharge.

B.    **Discriminatory Discharge Claim Against the City of Chester and the Defendants in their Official Capacities**

Plaintiff's suit against the Mayor and City Council members in their official capacities is functionally equivalent to an action against the entity these individuals represent, the City of Chester.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).  Because the City of Chester has been named in this case, Plaintiff's official-capacity claims against the Mayor and the City Council members are redundant.   See Busby, 931 F.2d at 776.  Accordingly, Plaintiff's official-capacity claims are hereby **DISMISSED**.

Turning to the discriminatory discharge claim against the City of Chester, a plaintiff cannot rely on a *respondeat superior* theory to hold a municipality liable for individual actions of its officers. <u>Monell</u>, 436 U.S. at 691. Instead, a plaintiff must establish (1) that her constitutional rights were violated; and (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the custom or policy caused the violation.[11] <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).

As discussed above, Plaintiff cannot establish that a federally protected right was violated; therefore, Plaintiff's discrimination claim against the City of Chester necessarily fails.

To be thorough, however, even if the Court had identified a genuine issue of fact with respect to Plaintiff's termination, she must still identify a municipal policy or custom that caused her termination. Here, Plaintiff contends

---

[11] Additionally, a single decision of a final municipal policymaker can suffice to hold the government entity liable. <u>See</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). It is undisputed that the Mayor was the final policymaking authority respecting the hiring and firing of city employees, which included only the City Clerk, the Assistant City Clerk, outdoor lawn and maintenance workers, and a night watchman (Parker Dep. at 7-8). However, as discussed above, the Mayor's decision to terminate Plaintiff was not discriminatory, and thus the City of Chester cannot be held liable based upon this single decision. Moreover, Plaintiff's attempt to fold the City Council members into liability based upon their alleged acquiescence to the decision is unavailing because the City Council did not vote to terminate Plaintiff and had no influence over the decision.

that "Defendants maintained a policy of replacing black employees with white employees . . . ."[12] (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 26, at 28.) Nevertheless, past this conclusory statement, Plaintiff presents no evidence that there was a policy of replacing black employees with white employees. The fact that the Mayor hired Plaintiff to begin with belies this notion. Moreover, the Mayor had hired a black City Clerk in the past; Cassie Cason, a black female, had held the position of City Clerk for four years prior to McCook's predecessor. (Parker Dep. at 63.) The Mayor testified that he wanted to hire one black and one white for every position. (Id. at 42.) Outside the office of City Clerk, the Mayor had hired both black and white, including a black night watchman and a black lawn man. (Id. at 8.) Accordingly, Plaintiff cannot show a policy of discriminatory hiring practices to hold the City of Chester liable.

## IV.  CONCLUSION

Upon the foregoing, Defendants' motion for summary

---

[12]  Plaintiff also contends that Defendants maintained a policy of "treating white employees more favorably than similarly situated black employees." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 26, at 28.) Yet, other than her ultimate termination, Plaintiff has presented no evidence that she was treated any differently than a similarly positioned white employee, or more specifically, McCook. In fact, Plaintiff had similar job duties to McCook and could make her own schedule. Moreover, the Mayor's alleged offensive comments took place after McCook was gone so that there is no comparator. In short, Plaintiff has not demonstrated disparate treatment while she was an employee of the City of Chester.

judgment (doc. no. 20) is **GRANTED**.  The Clerk is instructed to **CLOSE** this case and **ENTER JUDGMENT** in favor of Defendants.

ORDER **ENTERED** at Augusta, Georgia, this _22nd_ day of February, 2016.

_____
UNITED STATES DISTRICT JUDGE